[No. 2248.]

## CLIFF COOK *v.* THE STATE.

1. MURDER—EVIDENCE.—It was proved by the State on a trial for murder that, immediately before the shooting, the defendant's wife called to him to get his pistol, and when he did so and returned to the place where his wife and the deceased were disputing, the woman several times ordered the defendant to shoot, which he presently did, inflicting the fatal wound. It was objected by the defense that the evidence recited the acts and declarations of the defendant's wife, which, as such, could not be used in evidence against him. *Held,* that the objection was not well taken. The declarations being verbal acts during the progress of the offense, they were admissible as a part of the *res gestae.* Moreover, the evidence disclosed the wife to be a principal with defendant in the commission of the offense, and her declarations were admissible under the uniform rule that the declarations of one of the parties principal, made at the time, during the progress and in furtherance of the common design, are competent evidence against any or all of the co-conspirators. See the opinion *in extenso* on the question, and for the reason of the rule.

2. SAME—DYING DECLARATIONS—PREDICATE.—See the opinion *in extenso* for evidence *held* sufficient to establish the necessary predicate for the admission of the dying declarations of the deceased.

3. SAME—EVIDENCE.—Proof of general reputation is sufficient to show the character of a house as a disorderly house; that it was kept for the purpose of public prostitution, and that the occupants thereof were prostitutes.

4. SAME—PRACTICE IN THIS COURT—CHARGE OF THE COURT.—It is not within the discretion of this court to consider the effect of an erroneous charge upon the jury, if exception to it was reserved at the proper time; but this court will revise an erroneous charge, in the absence of a proper exception, when it is made to appear that the error was calculated to injure the defendant's rights.

5. SAME—SELF DEFENSE.—Omission in a trial for murder to charge the law of self defense, in the absence of any evidence tending to raise that issue, is not error.

6. SAME—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Bexar.    Tried below before the Hon. G. H. Noonan.

The indictment in this case charged the appellant with the murder of Wm. M. Russell, in Bexar county, Texas, on the twentieth day of December, 1885.  His trial resulted in his conviction of murder in the first degree, and his punishment was assessed at a life term in the penitentiary.

A. R. Jones was the first witness for the State.   He testified that at the time of this trial, which was had in March, 1886, he had lived in San Antonio, Texas, some three months, and during that time had known the defendant as Cliff Cook.   After midnight on December 21, 1885, the witness and the deceased, William Russell, went to the house of Lilly Gibson.   The witness did not then know Lilly Gibson, nor any of the several parties he saw at her house.   Williams and Russell had been in the house but a few minutes when a girl, afterwards known by witness as Lilly Wall, suggested to Russell to buy a bottle of beer, to which Russell agreed.   This conversation transpired in the parlor, at which time the witness did not see either Lilly Gibson or the defendant.   Russell and the Wall woman, and witness and another, then went to Wall's room to drink the beer.   Having drank the beer, the witness proposed to Russell to go back to town.   Russell replied that he would go as soon as another bottle of beer was drunk.   The second bottle was drunk and witness stepped to the water closet.   On his return therefrom he met Russell, and asked him where he was going.   He replied that he was going to the water closet.   The witness then looked into the room and saw Lilly Wall, and also a servant holding a waiter with forty or forty-five cents on it.   Witness then stepped to the gallery and there met Russell.

Up to this time nothing had passed between Miss Gibson and Russell, unless it transpired while either witness or Russell was at the water closet.   About the time that witness and Russell met on the gallery, Lilly Gibson appeared and said to Russell: "You owe for the beer; I want you to pay for it."   Witness handed Miss Gibson fifty cents, remarking to Russell:  "Have no trouble about it; every thing is settled now; let's go."   Russell agreed, and he and witness started off.   Witness had reached

a cross street about fifteen feet from the back gate, when he heard shooting. Turning, he saw Russell stagger. Russell was then about five feet from and in front of a gate on the street. Witness ran to Russell, and he fell just as witness reached him, crying: "I am shot." Witness then saw a pistol lying near Russell, and picked it up, when the officers stepped forward and arrested him (witness) and took him back inside the Gibson yard. When witness was taken into the yard Lilly Gibson said: "That man (witness) did the shooting; that man, Cook, is innocent." Cook was then placed under arrest. Russell was then in the hands of the officers, and they were holding him up.

The defendant's objection to the witness testifying to the statement of Lilly Gibson, upon the ground that she was defendant's wife, was overruled, and he excepted.

William Hill testified, for the State, that he was a merchant policeman, and, on December 20, 1885, at about two o'clock a. m., was standing on the corner of Main street and Main plaza, at which hour he heard four shots fired at or near Lilly Gibson's house. There was a slight interval between the first and second shots. The second, third and fourth shots were fired in rapid succession. Witness saw Policemen Wilkins and McLellan in Gibson's yard. Witness went into Gibson's yard through the gate on the cross street. Russell was then lying on the plank walk, near the gallery of Gibson's house. A number of girls, including the landlady, Lilly Gibson, were standing near Russell. About three minutes after the witness's arrival, the defendant said: "I want that man got away from here; he is drunk." Lilly Gibson was then standing on the gallery. Witness saw a forty-four calibre pistol, four of the chambers of which were empty. He saw another small pistol, with none of the chambers empty. Russell was taken in a hack to police headquarters.

Cross examined, the witness testified that he knew the State's witness, A. R. Jones. Witness arrested Jones, who was taken to police headquarters and searched. No arms of any description were then found on Jones's person. The large pistol was taken from Lilly Gibson, and the small one had been taken from Jones. No pistol was taken from Cook, so far as the witness knew.

Joe Wilkins testified, for the State, that he was on the police force of San Antonio, on the twentieth day of December, 1885, and was at Lilly Gibson's house on that night. The witness and Policeman McLellan were stationed at Krish's hall, about

three hundred yards distant from Gibson's, and about two o'clock they heard four shots fired at Gibson's house, whither they rapidly went. Witness then saw Jones and Russell in the alley or cross street. Going inside, he saw defendant and Lilly Gibson. Witness and McLellan reached Gibson's house about two minutes before Hill did. McLellan took a pistol from Jones, which the witness did not examine. The witness and Hill took a forty-four calibre pistol from Lilly Gibson, four chambers of which had been discharged. Several girls came out of the south part of the house after Cook and Gibson came out of a room on the northwest corner. Lilly Gibson came out of that room three or four yards ahead of Cook. Witness examined the premises on the next morning, and found blood on the sidewalk outside the gate.

Cross examined, witness testified that he met Jones and Russell as he turned into the alley. Jones had a pistol in one hand, and was holding Russell, who was shot, with the other. Russell was staggering, and finally gave way.

Joe McLellan testified, for the State, that he was on the San Antonio police force on December 20, 1885. The defendant at that time was living with Lilly Gibson, but witness did not know which of the rooms in the Gibson house he occupied. The Gibson house fronted on Acequia street, was bounded on the north by an alley, on the east by Soledad street and on the south by Houston street. Soledad and Acequia streets ran north and south, and Houston street and the alley east and west. The Gibson house was a well known house of prostitution. The witness, who was with the State's witness Wilkins, went to Gibson's house after hearing two shots, and as they turned into the alley they met Jones and Russell. Jones had a pistol in one hand and was holding Russell with the other. Witness took the pistol from Jones and found it loaded all around. It was a thirty-two calibre. Witness remarked to Jones: "You did the shooting." Jones and Russell replied: "It was done inside." They were then taken into Gibson's yard, where Russell fell. Gibson then came out of her room, followed by the defendant, who said: "The man shot at my wife twice; that other man is drunk, take him out of here." Jones had a pistol and Lilly Gibson had one. Witness saw four women there besides Gibson. One was named Lilly, one Jennie and another Ida Baker. Lilly Gibson and Cliff Cook were arrested a few minutes after witness reached the Gibson house. About the

time that witness reached the house he saw a man going down the street, but did not know that that man had been at Gibson's house. He saw a negro boy at the Gibson house. Witness examined the premises a day or two after the shooting and observed the imprint of a pistol ball on the northeast corner of the house, eight or ten feet from the gallery, and also saw where another had struck the strap of the gate, and where still another struck the edge of the sidewalk, two or three feet from the gate. Those impressions appeared to be of balls about forty-five calibre in size. The pistol taken from Lilly Gibson was a forty-five in size. This witness's testimony as to the character of the Gibson house was excepted to by defendant.

Willie Nickols was the next witness for the State. He testified that he was in the employ of Lilly Gibson, as waiter, messenger, etc., at the time of the tragedy. He lived and slept at the Lilly Gibson house at that time. Six women besides Lilly Gibson lived there at that time. Witness did not know the name of one of them. The other five were Ida Baker, Lilly Wall, Carrie, Stella and Jennie. Cliff Cook was the only man who lived at the house, but others came to the house and stayed over night. Cook's was the corner room, next to that occupied by Miss Jennie. Russell and Jones came to the house together on the night that the former was shot. They ordered some beer, which they paid for and drank in the parlor, Lilly Wall and Miss Carrie drinking with them. Russell paid for that bottle of beer and another bottle was ordered, which the witness opened, and they drank in Lilly Wall's room. Russell and Jones started off, Russell paying Lilly Gibson forty-five cents on the last bottle of beer and Jones paying her fifty cents. Lilly Gibson abused the deceased in violent language, calling him, among other things, a "bastard son of a b——," and went to Cliff Cook's room and told him to bring his pistol. Russell was on the long walk going towards the gate when Lilly Gibson passed into Cook's room. The witness at that time was at the hydrant, about eight feet from the walk, drawing water for Miss Stella. About the time that Miss Gibson got to the parlor door Cook came out of his room with his pistol in his hand. Miss Gibson called to Cook several times to fire, and Cook accordingly fired four shots. Three of those were fired while witness was at the hydrant, and the other just as witness stepped from the hydrant to the plank walk. Witness was not over ten steps from Cook when he did the shooting. Lilly Gibson and Miss Carrie were about the parlor

door at that time. Cook fired from the gallery. Lilly Gibson took the pistol from Cook after the shooting, walked along the gallery, and claimed that she fired the shots. Witness could only partially see Russell at the time the shots were fired. The police officers brought Russell into the Gibson yard after the shooting. Russell was at the house about thirty minutes. If he had a pistol witness did not know it.

This witness was subjected to a very searching cross examination by the defense, which, however, was ineffectual to change, in any material respect, his testimony in chief. He declared that when he took the first bottle of beer to the parties, who were then in the parlor, Russell had no pistol exposed. Witness at no time saw Russell threaten Miss Lillie Wall with a pistol or otherwise. If he had a pistol, either in the parlor or in Miss Wall's room, to which they went to drink the second bottle of beer, the witness did not know it, nor did he see it, though he went with them from the parlor into Miss Wall's room, with the beer. When Russell and Jones left the house they went towards the gate, Jones in advance. Russell was going towards the gate when he was called a bastard son of a b—h. He said nothing in reply that the witness heard. Witness was then standing in the parlor door, and was near enough to hear Russell, had he replied. Cook fired the first shot from the gallery, near the first post from the parlor door towards the gate. That first shot struck the corner of the house. At that time witness was at the hydrant, about a yard and a half from the corner of the house, from which place he could see around the corner, and could and did see the first shot fired by Cook from the post. Cook came out of his room with the pistol while witness was going to the hydrant. The shooting frightened witness, and he did not know which way to go. He could escape danger by going into the corner of the house. Mrs. Myers asked witness about the killing, and witness pretended to her to know nothing about it, and told her no more than that Lilly Gibson killed Russell for five cents. The difficulty did, in fact, originate over a deficiency of five cents in the payment for the last bottle of beer. Witness saw Breeding at Gibson's house on that night, before the difficulty. He and Cook were alone in Miss Vick's room (the room next to Gibson's), and witness took them a bottle of beer. This was about four hours before the shooting. Breeding left by way of the gate, and witness next saw him after the shooting and the arrest of Cook and Lilly Gibson, when he came to the house

and asked for Cook and Gibson. Russell and Jones were outside of the gate when the shooting took place. Witness could then see Russell but could not see Jones. Russell was just stepping from the platform out of the gate when the first shot was fired. Witness heard Lilly Gibson tell Cook to shoot, but did not hear any one say: "You are too cowardly to shoot." If Russell had had a pistol in his right hand when he went out at the gate, witness could have seen it. Jones was some where outside of the gate when the shooting occurred, but witness did not know where. Early on the morning after the shooting, Mr. Anderson, the defendant's attorney, came to Gibson's house, and told witness to say, in response to all questions about the killing, that he knew nothing about it. The testimony of this witness, with respect to the declarations of Lilly Gibson, was objected to by the defense, but the objection was overruled.

Jesse A. Bennett testified, for the State, that he was a member of the police force of the city of San Antonio, and was on duty about two squares distant from the Gibson house when Russell was shot. He repaired to the Gibson house at once, where he found everything in confusion. Three policemen had hold of Russell. Lilly Gibson claimed that she was shot. Witness remarked: "This man (referring to Russell) is shot." Cook said: "The man is drunk; take him away." He made no other remark that witness heard. Witness went to the police station and got Assistant Marshal Cardenas, and when he returned he and Officer Ziegler got a hack and took Russell to the police station. En route, Russell said: "Get me a priest; I am going to die." When the station was reached Russell was confronted by Jones, and said: "That man is my friend; he did not shoot me." Russell repeatedly called for a priest, saying that he was going to die. He died on the next day. Gibson and Cook were in the same room with Russell at the station house. Russell said: "That man up there—the man with a small black moustache—shot me." He said something about the man being a pimp, and that he was going away from the man when he was shot, and did not know why he was shot.

Cross examined, the witness said that Russell was shot in but one place. Russell's statements at the station were voluntary, and were not made in response to questions. He was asked if he knew who shot him, and he replied that he would know the man. Cook's name was not mentioned to Russell, nor was Cook described. Defendant objected to the testimony of this witness

as to Russell's statements, upon the ground that they were suggested statements, and did not come within the rule of dying declarations. The objections were overruled.

Doctor Amos Graves, testifying for the State, described the wound which produced Russell's death as one made by a ball which entered the right side at about the seventh rib and ranged downward towards the liver. Cross examined the witness said that he was familiar with the Gibson premises. That part of the house which rests on Acequia street is rock. A wood addition commences where the rock work stops. Going from the house, on the walk, to the gate, the right side of a person would be to the east—the opposite direction from the house. If on the walk, going toward the gate when he was shot, Russell could not have been shot from the house. The gate is a narrow one, flanked on the right by a high fence. If a person going out at the gate should turn towards Soledad street, his right side would be exposed to the range of a person firing from the gallery of the Gibson house.

William Sims testified, for the State, that he was on Soledad street at the time of the shooting, on the opposite side from Gibson's house. He was separated from the Gibson house by the width of Soledad street and an open lot. Just before the shots were fired, witness heard the voice of a woman, and recognized it as that of Lilly Gibson, which exclaimed: "Fire, God d—n it, fire!" That exclamation was followed by a shot, a pause, and then by two shots. Witness went to the Gibson premises, saw five or six people collected, and that something was wrong. He accordingly left. It was the witness's first impression that the house was on fire, and that the pistols were discharged to give the alarm. This witness's testimony was objected to upon the ground that Lilly Gibson's declarations were not *res gestæ*.

Owen I. Cook testified, for the State, that he was a carpenter. Russell was a carpenter, and was working for witness at the time he was shot. Witness saw Russell the day before his death, at about twelve o'clock. He died at the house of his mother, Mrs. Davis. Mrs. Davis and another lady were present. Russell remarked that he was glad witness had come, as he was about "gone up," and wanted to tell witness about the shooting. He repeated several times that he knew he was going to die. His statement was purely voluntary, and was not made in response to inquiries. He told witness that he and a young man named Jones went from the Revolving Light saloon to Lilly

Gibson's house; that he bought and paid for a bottle of beer; that one of the girls presently asked him to treat to another bottle, which he did, paying for it in fractional money; that the woman afterwards insisted that the last bottle was not paid for, and Jones paid for it a second time, and he and Jones started off; that when he reached the side walk and was about to step into the street, he heard one of the girls curse him; that he then looked back and saw a man pointing a pistol at him; that he then attempted to draw his pistol, but the man fired on him twice before he could get it out; that the man fired the third shot just as he got his pistol out, which shot struck him, and he fell, dropping his pistol. He said that he tried to defend himself, and did not know whether or not he fired a shot, and asked if witness knew. He said that he called to Jones for help. He gave witness no description of the man who fired the fatal shot.

Cross examined, the witness testified that Russell's statement was made to him about noon on Sunday. He heard of Russell's death about noon on the next day. Two or three persons came into the room while witness was there on Sunday. Mrs. Davis, Russell's mother, was present during the greater part of the time witness and Russell were talking. Doctor Graves came in, but Russell had then finished his declaration. Russell was weak but perfectly calm when talking to witness. Mrs. Davis did not tell Russell to tell witness about the difficulty. On the contrary, she asked him not to talk, but to keep quiet. Witness went to see Russell because Russell was in his employ and not because he expected to hear about the trouble. The defense objected to the witness's testimony as to the declarations of the deceased, which objection was overruled.

Joe Wilkins was recalled by the State and identified a forty-five calibre pistol in evidence as the one taken from Lilly Gibson just after the shooting. He did not know who owned that pistol. The State rested.

Lilly Wall was the first witness for the defense. She testified that, on the night of December 20, 1885, she lived at Lilly Gibson's house, 214 Acequia street, San Antonio, Texas. Russell, the deceased, came to Gibson's house on that night, between twelve and one o'clock. He took a seat on a sofa in the parlor and called witness to him. Witness sat down by him. Presently witness started to get up to meet another gentleman who came in, when Russell presented his pistol at witness's head and

witness resumed her seat. The other gentleman, Mr. Jones, sat down by Russell and tried to get his pistol. Russell asked him not to take it, remarking: "That is the only friend I have." Russell then invited witness to take a ᵍlass of beer with him. Witness agreed, and she, Russell, Jones ~~Miss Carrie Foster~~ went into another room and drank a bo ~~ᴐf beer, for which~~ Russell paid. Russell then ordered anot ~~bottle of beer of~~ Miss Lilly Gibson, who came to the door ~~the room. That~~ bottle was drunk and Russell paid forty-fiv ~~cents on it. Rus-~~ sell went out into the yard and witness went ~~to Miss Gibson, re-~~ ported the beer transaction and went thence ~~into the parlor and~~ remained in there until after the shooting ~~was over and the~~ policemen came. She heard but did not see ~~the shooting. The~~ parlor door was locked. There were at least fifteen men in the parlor at the time of the shooting. Witness was unable to say whether or not there were any men in other parts of the house at that time. Witness saw the man Breeding between eleven and twelve o'clock, which was before the shooting, in Miss Vick's room, which was the next room to Cook's, across a hall. Witness thought Cook was with Breeding, though she did not see him. Vick's door led from her room to the gallery. One could go from the gallery into the hall and thence into Cook's room. Russell was drunk and had a pistol, which Jones tried to get. Jones had no pistol that the witness saw. Witness did not know who did the shooting.

Cross examined, the witness said that Cook and Lilly Gibson were on the gallery when the police came, just after the shooting. Big Jennie and Carrie were also there. Several men were in the parlor when the police came. Witness knew none of the men. They left by way of the gate after the shooting. The coal oil lamp in the hall was burning when witness went into the parlor, before the shooting. It was not, when she came out of the parlor afterwards. Witness, when she got out of the parlor, saw the officers and Cook and Lilly Gibson, but no one else.

D. H. Breeding was the next witness for the defense. He testified that he was at Lilly Gibson's house on the night of December 20, 1885. Trouble came up in that house after twelve o'clock on that night. While the witness was in the alley he was passed by Cook and his wife, coming from Acequia street. Witness shook hands with Cook and went into the house with him. During the conversation between witness and Cook, which ensued when they got inside the house, witness heard a noise

in the yard and walked out on the gallery. He returned and told Cook that he thought there was some trouble out there. Witness saw a man standing some six or eight feet from a tree, and heard him say: "You God d—d old whore, you, I can do you up; I have the best pistol." The woman replied: "You are a coward; you have not got the nerve to fire that gun." Cook asked witness not to leave, saying that there would be no trouble. Witness started back into the house, passing Cook. He had scarcely passed Cook when a shot was fired. As he turned he saw Cook fire two shots towards the gate. Quite a commotion ensued, during which the witness walked to the rear of the house, remained about ten minutes and then left. Rus- sell, the man who was standing near the tree, flourishing the pistol, was killed. The witness heard but three shots—the two fired by Cook, and one other. A person can not stand at the hydrant on the Gibson place and see a person standing at the first post on the gallery. The gate was in the range of Cook's shots. Witness saw a bullet hole in the gate and another at the corner of the house, but could find none on the walk. Both Russell and the woman spoke in a loud tone of voice. Russell faced Gibson and the house. If Gibson had any arms witness did not know it. Witness several times saw the girls passing in and out of the house. Witness saw the negro boy Nickols a few minutes before the shooting, but did not see him when he saw Russell, immediately before the shooting. Witness was far enough out of the house when Cook fired the two second shots to see the hydrant. He did not see the boy at the hydrant. He afterwards saw the boy in the yard, with wood in his arms, and asked him to see if any body was just outside of the yard, as he, witness, wanted to get away. The negro boy, who was badly frightened, said: "No, boss; I have just looked."

Cross examined, the witness said that he had known the de- fendant three or four years. Witness had never boarded at the Gibson house, and had never spent a night there. Witness saw Cook, Lilly Gibson, several women, the negro boy and Russell at the house on the night of the shooting. Witness and Cook were in the third room from the northwest corner of the house. Three women came into that room while witness and Cook were in there. Those women were Lilly Wall, Ida Baker and Jennie Dean. From the time witness went into the room he did not go out of it until just before the shooting. He went back just after- wards and remained until he left the house. Russell was on the

walk when witness first saw him, just before the shooting. It was not a fact that witness left the house before the shooting. He did not know who, whether Cook or some other person, fired the first shot. From Gibson's house witness went to police headquarters, leaving Gibson's ten or twelve minutes after the shooting. Witness saw no police at Gibson's house when he went out of the house after the shooting. The tree near which Russell was standing when witness saw him was three or four feet from the walk, and nearer to the gate than to the gallery posts. Witness left Cook's room to go home just before the shooting, because he thought a difficulty was coming. He went back when Cook told him that the man was only drunk and would make no row. Cook was on the porch when witness started to the gate. Cook was in the door when he called witness back, and at that time witness was directly opposite Russell, and out of Cook's sight. Russell had on a light colored overcoat. Witness could not say what kind of a hat he had on. Witness was a brakeman on train No. 21 of the Galveston, Harrisburg and San Antonio railway, and came into San Antonio on that train on that night. The train had been in over an hour when witness went to Gibson's. It was due, on schedule time, at forty-five minutes past nine. Witness did not know whether or not it got in on time. Witness did not talk to Jesse Bennett about the killing. McLellan asked him about it, and witness told him that hell had been raised. As a fact, he did not then know that any body had been hurt, but the woman Carrie had told him that three men were killed. Witness's object in keeping out of sight that night was to prevent the publicity of his presence at the house, and he did not want to be called upon to testify in the case. He had since attended the women publicly on the streets, concluding that since he was known to have been there, he could not be hurt in public esteem. Witness saw no men in the parlor. He saw no men there that night except Russell, Cook and McLellan—not policeman McLellan. Witness and Cook were in the room together perhaps twenty minutes before the shooting took place. Witness, while under the rule, talked to other witnesses about the case, but had not told what his testimony would be. He heard witnesses tell their stories about the shooting. But three shots were fired during the difficulty. The hydrant was not visible from the point where Cook fired the last two shots. A man would have to be six or eight feet from the hydrant to have seen Cook,

around the corner of the house, at the time of the shooting. The walk from the house to the gate was straight. The corner of the house was not on a line between those points, and it would be a bad shot on the part of any one standing on the gallery, designing to shoot at the gate to strike the corner of the house. At the time of the shooting Lilly Gibson was standing on the gallery, seven or eight feet from the parlor door. If she called Russell a bastard son of a b—h witness did not hear her, though she may have done so.

W. W. Herron testified, for the defense, that he went with Anderson, the defendant's counsel, to the Gibson place. Anderson went to the hydrant. Witness could not see him from the first post on the gallery, and could only see his coat tail from the second post. A person firing from the first gallery post could not strike the left hand gate post. Witness did not know how Anderson was standing with reference to the hydrant when he was looking from the second post. Witness did not look from the hydrant to see if he could see the post. A person standing at the hydrant to draw water would be thrown out about two feet from the hydrant.

The defense closed by introducing in evidence the record of the marriage of Cliff Cook and Lilly Gibson, and the indictment charging the said Lilly Gibson with the murder of William M. Russell.

A. R. Jones testified, for the State, in rebuttal, that Russell was dressed in dark clothes and hat, when shot, and had on no overcoat. Russell pulled his pistol in Gibson's parlor, but made no demonstration with it towards Lilly Wall. He put it up of his own accord. Witness made no effort to take it away from him.

Stella Harper testified, for the State, in rebuttal, that she occupied a room in Gibson's house at the time of the shooting. She sent the witness Willie Nickols to get her some water, just before the shooting. He got back with it just after the shooting. The hydrant was the only place on the premises from which water could be had.

Superintendent Van Vleck, of the Galveston, Harrisburg and San Antonio railway, testified, for the State, in rebuttal, that freight train No. 21 reached San Antonio on time, at half past nine o'clock, on the night of December 20, 1885.

William Hill, recalled by the State, testified that the lights in the hall at the Gibson house were burning when he reached

there and left, which was after the shooting. Russell did not have on an overcoat, and was dressed in dark clothes.

Nat Lewis, sheriff of Bexar county, testified, for the State, that he had examined the Gibson premises. If a person were to stand back on the gallery, two or thre feet from the post nearest the hydrant, he could not be seen by a person standing at the hydrant in a natural position. But if standing near that post at the edge of the gallery, he could be seen from the hydrant by the person at the hydrant leaning a little. A person at the hydrant by bending his neck a little could see a person standing at the post near the parlor door. The stop cock of the hydrant is towards the plank walk. A tub was sitting under the hydrant and extended over two feet, and to that extent would impede the approach of a person drawing water from the hydrant. Witness saw the bullet hole in the gutter at the corner of the house. A stick placed in that hole showed the ball to have been fired from a line which struck the post on the gallery near the parlor door. That ball could not have been fired from the post nearest the hydrant.

Jesse Bennett, recalled for the State, testified that D. H. Breeding reached the police station a minute or two after witness reached it with Russell. Witness asked him if he knew Russell, and he said that he had never seen Russell before. Several witnesses testified that Russell had on dark clothes and no overcoat when he was shot.

The motion for new trial raised the questions discussed in the opinion.

*M. G. Anderson, A. J. Evans* and *Walton, Hill & Walton* filed separate briefs for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. The appellant was convicted in the court below of murder in the first degree, with a life term penalty assessed in the penitentiary.

The party killed was one William M. Russell, and the record shows that the fatal shooting took place on the night of December 21, 1885, after midnight, between twelve and one o'clock. The shooting took place at a brothel kept by one Lilly Gibson, or just after the deceased had started to leave, and was leaving said house of prostitution. Lilly Gibson, the keeper of the

bagnio, was the wife of this appellant, and appellant had rooms and lived at and slept in said house.

Appellant was in his room in said house, when an altercation occurred between the deceased and Lilly Gibson, about the payment by deceased for a bottle of beer. Deceased was intoxicated, and his friend attempted to settle the altercation between him and the woman Gibson, and had succeeded so far as to get him started away from the house to his own place of abode, and they had gotten outside of the gate of the premises when the woman Gibson called to her husband, the defendant, "to get his pistol and bring it there," and as he emerged upon the porch where she was standing, she told him several times, "to fire." He immediately fired three shots, one of which took effect, and produced the death of the deceased.

It is claimed that during the wordy altercation between the parties above mentioned, deceased had used insulting language towards the woman Gibson, the wife of appellant, and that he had called her "a damned old whore."

This is a brief, succinct statement of the material facts shown by the record. There are no independent bills of exception in the record, but several were reserved during the trial, and are shown in the statement of facts, to the admission of the testimony of the witnesses, as follows:

1. Objection was made by defendant to testimony as to acts and declarations of Lilly Gibson, upon the ground that she was the wife of defendant, and therefore her acts and declarations could not be used against him.

2. Objection was made by defendant to admitted testimony of the reputation of the house kept by Lilly Gibson as a house of prostitution, and that the inmates thereof were prostitutes.

3. Objection was made to the admission of the dying declarations of the deceased, Russell.

With regard to the declarations of the wife, made during the progress of the difficulty, just preceding and subsequent to the shooting of Russell, they were admissible as verbal acts and were clearly parts of the *res gestœ*, and consequently did not come within the rule announced in Article 735, Code of Criminal Procedure, which prohibits a husband and wife from testifying against each other in a criminal prosecution.

Again, the evidence as developed in this case shows that the husband and wife acted together in the commission of the offense, and are both principals, and the rule is uniform that the

declarations of one of the parties principal made at the time, during the progress and in furtherance of the common design, are admisible in evidence and binding upon the other co-conspirators. (Cox v. The State, 8 Texas Ct. App., 256; Loggins v. The State, Id., 434.)

Mr. Wharton, in his work on Evidence, section 252, says: "It is in any view clear that declarations which are the immediate accompaniments of an act are admissible as part of the *res gestæ.*" Again, in section 263, he says that "the wife's declarations, forming a part of the *res gestæ,* are admissible against the husband."

This doctrine is maintained in civil cases at common law. (Johnson v. Sherwine, 2 Gray, 374; Walton v. Green, 1 C. and P., 621; Gilchrist v. Bale, 8 Watts, 355; Aveson v. Lord Kenard, 6 East, 188; Thompson and wife v. Freeman, 1 Skinner, 420.) At common law, the rule which in civil cases excluded the husband and wife from testifying against each other was the same as that which is announced by our statutes with regard to criminal cases. There is no law of this State which governs or regulates the admission of declarations of the wife affecting the husband, when they constitute a part of the *res gestæ,* and there being no specific rules prescribed by statute, other rules of the code relegate us to the common law for the rules which are to govern. (Code Crim. Proc., Arts. 27 and 725.)

We shall therefore adhere to the common law rule as expressed in the authorities above cited, and hold the declarations of the wife admissible against the husband as a part of the *res gestæ;* for it is indispensable to a correct understanding of every transaction that every act attending it, verbal as well as physical, by whomsoever it may be committed, be placed before the court for its enlightenment. This rule as to *res gestæ* overrides all other rules known to the law governing the admissibility of testimony. The court below, then, did not err in so admitting the declarations of Lilly Gibson as complained about in this case.

We are also of opinion that the objection of appellant to the admission of the dying declarations of the deceased, Russell, as made to Owen I. Cook and Jesse Bennett, are equally untenable. The evidence clearly shows that the deceased was conscious of approaching death when he made the declarations, and the only objection urged to them is upon this ground. The deceased said he was going to die, and wanted a priest. He said this continually, according to Bennett's testimony. To Owen I. Cook he

stated that it·was no use, he was going to die; thus showing clearly that the predominant idea in his mind, the all absorbing topic with him, was approaching dissolution. This was sufficient proof to establish the predicate for their admission, and the court did not err in so admitting them. (Hunnicutt v. The State, 18 Texas Ct. App., 498; Id., 20 Texas Ct. App., 632; Temple v. The State, 15 Texas Ct. App., 304.)

. As to the third exception, as stated in the bill, the language is: "The defendant excepted to the statement of witness that the house kept by Lilly Gibson was a house of prostitution, and that the occupants thereof are prostitutes."

The rule is well established that the fact of the character of a house as a disorderly house, and that it was kept for the purpose of prostitution, and the character of the occupants thereof, may be proved by general reputation. (Morris v. The State, 38 Texas, 603; Sylvester v. The State, 42 Texas, 496; Allen v. The State, 15 Texas Ct. App., 320, and Benton v. The State, 16 Texas Ct. App., 156.) The evidence objected to was admissible and the ruling complained of was not erroneous.

The charge of the court is very seriously objected to, and it is urgently insisted that the same was erroneous in several particulars mentioned in the motion for new trial and in the assignment of errors, and ably discussed in the brief of counsel for appellant; but there was no bill of exceptions reserved at the trial to the charge or any portion of the same, nor to the refusal of the court to give such of the special requested instructions as the court declined to give, or refused because substantially given in the general charge. Had certain portions of the charge been excepted to at the time the charge was given, then there might have been a very serious question as to whether some of the errors pointed out would not have necessitated a reversal of the judgment. (Niland v. The State, 19 Texas Ct. App., 167, and authorities cited; Code Crim. Proc., Arts. 685 and 686.)

It is not within the discretion of this court to consider the effect upon the jury of an erroneous charge of the court, if the same was promptly excepted to at the time the same was given. In such a case the conviction must be set aside however immaterial the error may have been. (Clanton v. The State, 20 Texas Ct. App., 616; Bravo v. The State, Id., 188.)

Where a charge is not excepted to at the trial, but the same is objected to for the first time on the motion for a new trial, or in this court on appeal, then the question is whether or not such

charge was calculated to injure the rights of defendant, and, unless such is made to appear, this court will not revise the error. (Code Crim. Proc., Art 777; Bishop v. The State, 43 Texas, 390; Mace v. The State, 9 Texas Ct. App., 110; Henry v. The State, Id., 359; Gardiner v. The State, 11 Texas Ct. App., 265; Elam v. The State, 16 Texas Ct. App., 34; Mendiola v. The State, 18 Texas Ct. App., 463; Lewis v. The State, Id., 401.)

In addition to the general charge, which embraced murder in the first and second degrees, and manslaughter, six special requested instructions for defendant were also given in charge to the jury.

A portion of paragraph 6 of the general charge is specially complained of in the able brief of counsel for appellant. The words specially objected to are embraced in the following extract. Speaking of the *indicia* of express malice, the learned judge said: "These external circumstances indicating the design may transpire at the very moment of the killing as well as before that time; for, although the killing may have been upon an unexpected meeting, it may have been attended with such absence of passion and such a wanton, cruel, calculating method, *as will afford ample evidence to establish* in your minds the conviction that the killing was the result of a sedate, deliberate, and well formed design then and there to take the life of the deceased. The length of time that intervenes between the design so formed and its execution is immaterial, for the reason that an apparently instantaneous act may be accompanied with such circumstances and such want of provocation as to leave no doubt of its being the result of premeditation." There can be no question but that the charge announced a sound, abstract proposition of law. (McCoy v. The State, 25 Texas, 33.)

Two objections, however, are claimed against it, to wit: First. That it trenches upon the rule which forbids the court to charge upon the weight of evidence; and, secondly, because there was no evidence to call for, justify or warrant such a charge. Had exception been taken to the charge at the time it was given it might have presented a nice question for decision. But, even if we should concede that it was erroneous, there being no exception, we can not see, when viewed in the light of the evidence, that it was calculated seriously to affect and injure the rights of the defendant.

The same may be said with reference to other portions of the charge complained of, to wit, the charge upon manslaughter, in

so far as it was based upon insulting words and conduct of deceased towards the wife of defendant, the objection thereto being that it was not sufficiently full and explicit, as required by the Code, and presented a phase of the law not applicable to the facts in the case. (Niland's case, 19 Texas Ct. App., 166.)

There is not a particle of testimony affirmatively appearing in the record which shows that defendant either heard or was informed of the insulting words which had been used by deceased towards his wife. But even if such had been the case we can not say, under the peculiar circumstances developed in the record, that the charge would have been such error as must necessarily have injured the rights of the defendant.

Again, it is said that the court failed to charge, as part of the law of self defense, that it was not necessary for the defendant to retreat before killing the assailant. In our opinion the record utterly fails to show the slightest shadow or pretense of self defense. The deceased was leaving the house, being taken off by his friend, was drunk—almost helplessly drunk—had gotten outside of the premises of the defendant and his wife, when defendant, instigated by his wife, fired upon and inflicted the fatal shot which killed him.

As to the sufficiency of the evidence, after most mature and repeated consideration of the record, we have been unable to arrive at any other conclusion than that the verdict and judgment are fully warranted and supported by the facts.

Having found no reversible error, the judgment is in all things affirmed.

*Affirmed.*

Opinion delivered at Austin, June 23, 1886.